**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **FOX AND OWL MARKETING LLC**, an Oklahoma limited liability company,<br><br>Plaintiff,<br>v.<br><br>**MATTHEW RUFFNER**, an individual, doing business as OPTICL.AI INTELLIGENCE NETWORK,<br><br>Defendant. | ) | **Case No. 5:26-cv-01438-R** |

**PLAINTIFF'S FIRST AMENDED VERIFIED COMPLAINT**

Plaintiff, Fox and Owl Marketing LLC ("FOM") for its Verified Complaint against Matthew Ruffner ("Ruffner"), an individual doing business as Opticl.ai Intelligence Network, respectfully shows the Court as follows:

**PARTIES, JURISDICTION AND VENUE**

1. Plaintiff FOM is an Oklahoma limited liability company with its principal place of business in Oklahoma County, Oklahoma.

2. Defendant Ruffner is an individual residing in the State of Ohio.

3. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, and 1367

4. Plaintiff's claim under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 *et seq.* ("DTSA") arises under federal law and, accordingly, jurisdiction is proper under 28 U.S.C. § 1331.

5. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367, because they form part of the same case or controversy as the federal trade secrets claim.

6. This Court also has jurisdiction over this action through federal diversity jurisdiction as the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different states.

7. This Court has personal jurisdiction over Ruffner because he deliberately entered, maintained, and performed a substantial and continuing employment relationship with FOM, an Oklahoma company headquartered in Oklahoma City, Oklahoma.

8. During the hiring process, Ruffner communicated with Bryan Sekine, FOM's Oklahoma-based Chief Executive Officer, by email, text message, telephone calls, and video conferences concerning Ruffner's employment, compensation, start date, and job duties.

9. Ruffner knew that he was communicating and negotiating with FOM personnel located in Oklahoma, including Mr. Sekine and other FOM employees who lived and worked in Oklahoma.

10. Ruffner accepted employment with FOM as a Marketing Specialist effective June 1, 2025, pursuant to an offer letter signed by Ruffner and Mr. Sekine.

11. Throughout Ruffner's employment, he repeatedly and regularly initiated and participated in communications with Oklahoma-based FOM supervisors, executives, and coworkers as part of his employment duties, including multiple communications each workday, five to six days per week.

12. Ruffner met daily with FOM personnel, participated in monthly performance meetings, and collaborated weekly on projects managed by FOM's Oklahoma-based founders and supervisors.

13. Jenni Sekine and Bryan Sekine, each located in Oklahoma, supervised Ruffner, assigned him work, reviewed his performance, conducted daily meetings with him, administered systems together, and participated in relevant communications with Ruffner regarding his employment.

14. Ruffner participated remotely in FOM training sessions and company events hosted by personnel located in Oklahoma.

15. Ruffner's employment required him to communicate through FOM's designated email and project-management systems, respond timely during FOM's core work hours, and coordinate his work with FOM personnel.

16. Ruffner remotely accessed FOM's cloud-based storage accounts, databases, and proprietary systems that were administered by FOM personnel located in Oklahoma.

17. FOM's proprietary systems, client information, internal strategies, and business operations were administered and protected by FOM personnel located in Oklahoma.

18. Ruffner's compensation was paid by FOM, an Oklahoma business, and his performance metrics were tracked by FOM's Oklahoma-based founders and supervisors.

19. Ruffner's alleged misuse of FOM's proprietary information and client data arose directly from his employment relationship with FOM and his access to FOM's proprietary systems, confidential information, and internal operations.

20. Ruffner created an unauthorized account in the name of FOM's Chief Executive Officer, Bryan Sekine, who was located in Oklahoma, on the platform that later became Opticl.ai.

21. On April 15, 2026, Ruffner sent an email to Mr. Sekine while Mr. Sekine was in Oklahoma, while Ruffner knew Mr. Sekine was in Oklahoma, in which Ruffner solicited FOM and offered to refer Opticl.ai clients to FOM for agency services and requested further discussion concerning that proposed relationship. That e-mail is attached as Exhibit A.

22. Ruffner purposefully reached into Oklahoma to solicit an ongoing commercial relationship between Opticl.ai and FOM.

23. The claims asserted in this action arise from or relate to Ruffner's purposeful contacts with Oklahoma, including his employment relationship with FOM, his regular communications and meetings with Oklahoma-based FOM personnel, his access to systems administered from Oklahoma, his alleged unauthorized use of FOM's confidential information, and his solicitation of FOM's Oklahoma-based leadership concerning Opticl.ai.

24. Ruffner used information acquired through a continuing Oklahoma-centered employment relationship to harm a company he knew was headquartered, managed, and operationally administered in Oklahoma.

25. Service of a summons establishes personal jurisdiction over a defendant who is subject to the jurisdiction of a court of general jurisdiction in the state where this Court is located.

26. Venue is proper in this Court pursuant to because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district. FOM's principal

place of business is Oklahoma City, Oklahoma, which is in the Western District of Oklahoma. Ruffner's employment relationship was with an Oklahoma company in the Western District of Oklahoma. Further, FOM maintained its trade secrets and confidential information in this judicial district.

## FACTUAL ALLEGATIONS

27. FOM is a digital marketing agency specializing in AI-powered marketing services, including search engine optimization, generative engine optimization, and AI-driven marketing strategies.

28. On May 29, 2025, FOM hired Ruffner as a Marketing Specialist pursuant to an offer letter signed by both Ruffner and Bryan Sekine, FOM CEO. The offer letter established an effective start date of June 1, 2025, and a salary of $75,000 per year plus performance bonuses.

29. The offer letter incorporated by reference FOM's company policies, including the Employee Handbook and the AI Use & Ethics Policy.

30. FOM also referred to Ruffner as an SEO Specialist.

31. On October 6, 2025, Ruffner signed and acknowledged FOM's AI Use & Ethics Policy v2.0.

32. Ruffner also signed and acknowledged FOM's Employee Handbook, effective January 22, 2026.

33. The AI Use & Ethics Policy and Employee Handbook established contractual obligations regarding confidentiality, data handling, and intellectual property protection.

34. The AI Use & Ethics Policy, in Section 1, established a Client-First Approach as a core ethical principle, requiring that AI use not compromise client privacy, intellectual property, or trust.

35. The AI Use & Ethics Policy, in Section 2.1, established a data classification system and prohibited employees from inputting "Prohibited" data into any AI tool. "Prohibited" data includes client personally identifiable information, proprietary client strategies, financials, and trade secrets.

36. The AI Use & Ethics Policy, in Section 2.2, prohibited employees from using inputs for model training without explicit consent.

37. The AI Use & Ethics Policy, in Section 3, required employees to comply with all applicable laws and regulations and to ensure that internal tools, methodologies, AI workflows, and proprietary systems remain the exclusive FOM property.

38. The AI Use & Ethics Policy, in Sections 4.1 and 4.2, established an AI Tool Approval Process, requiring employees to use only approved tools and to submit any new tool request to the department lead for approval, including security and compliance evaluations.

39. The AI Use & Ethics Policy, in Section 7, prohibited employees from using AI tools to bypass security measures or access unauthorized information.

40. The AI Use & Ethics Policy, in Section 10, required employees to immediately report suspected data breaches, privacy violations, and unauthorized disclosure of proprietary AI methods.

41. The AI Use & Ethics Policy, in Section 12, classified FOM's internal AI systems, workflows, methodologies, and strategies as strictly confidential and proprietary trade secrets.

Section 12 prohibited employees from disclosing, sharing, or demonstrating proprietary AI practices to external parties without explicit written permission from executive leadership. Section 12 prohibited employees from using proprietary AI practices for personal benefit or competitive advantage.

42. FOM's Employee Handbook established a Code of Conduct requiring Integrity and prohibiting Conflict of Interest. The Code of Conduct required employees to maintain the confidentiality of client information and proprietary business operations and to avoid conflicts of interest and disclose any potential conflicts to leadership.

43. FOM's The Employee Handbook established a Social Media policy prohibiting employees from disclosing internal projects, client results, or confidential data.

44. FOM's Employee Handbook established that all work created using company-owned devices or within company platforms remains FOM's intellectual property.

45. FOM has developed proprietary AI methodologies, client data pipelines, RAG setups, tool configurations, integrations with E2M, prompt libraries, custom GPTs, and internal automation systems. These proprietary systems and methodologies provide FOM with a competitive advantage in the AI-powered marketing services market.

46. FOM took reasonable measures to keep this information secret by: (a) classifying it as strictly confidential under the AI Use & Ethics Policy Section 12; (b) restricting access to authorized personnel; (c) requiring employees to sign confidentiality agreements; and (d) implementing a data classification system designating certain information as "Prohibited."

47. FOM licenses a generative engine optimization tool from Eldil Corp. at a cost of $100 per client.

48. FOM has integrated the Eldil tool into its proprietary AI workflows and charges clients $150 per client for the GEO service.

49. Eldil Corp.'s Terms of Service, Section 6.2(a), prohibits copying, modifying, or reverse engineering the Eldil platform's source code.

50. Without authorization from FOM or Eldil Corp., Ruffner copied source code from Eldil Corp.'s platform.

51. Ruffner admitted to copying Eldil source code in at least two recorded meetings with FOM's leadership, one of which was made after FOM instructed Ruffner to cease and desist any such impermissible uses.

52. Without FOM's authorization, Ruffner used proprietary client data classified as "Prohibited" under the AI Use & Ethics Policy to train a personal AI tool.

53. The client data Ruffner used included campaign strategies, performance metrics, and potentially personally identifiable information.

54. Without FOM's authorization, Ruffner replicated FOM's proprietary AI workflow, including client data pipelines, RAG setups, tool configurations, and integrations developed with E2M.

55. Ruffner used FOM's trade secrets and proprietary methodologies to create an unauthorized AI/GEO tool.

56. Ruffner created an account in FOM CEO Bryan Sekine's name without authorization in direct conflict with Section 7 of FOM's AI Use & Ethics Policy.

57. Ruffner added at least one of FOM's clients to his unauthorized tool for testing without consent from the client or from FOM.

58. Ruffner attempted to sell his unauthorized AI/GEO tool back to FOM for $150 per client, the same price FOM charges clients for the Eldil-powered service.

59. Ruffner actively concealed his conduct by not self-reporting it to FOM as required by Section 10 of FOM's AI Use & Ethics Policy.

60. Ruffner only disclosed his conduct through an unsolicited sales pitch to FOM's leadership.

61. FOM discovered Ruffner's misconduct on February 25, 2026 and terminated his employment on February 27, 2026, during which call Ruffner proposed wiping and destroying any such impermissibly obtained data, which Ruffner did not do.

62. During meetings with FOM's leadership, Ruffner made recorded admissions regarding copying Eldil source code, using client data, creating unauthorized accounts, and enrolling clients without consent.

63. Ruffner is currently operating a business called Opticl.ai Intelligence Network ("Opticl.ai").

64. Opticl.ai is Ruffner's sole proprietorship and is not a business organized or incorporated as a separate legal entity.

65. Through Opticl.ai, Ruffner is marketing and selling an AI/GEO tool that incorporates FOM's intellectual property, proprietary methodologies, and client data.

66. Ruffner's Opticl.ai website is accessible at www.Opticl.ai.

67. Opticl.ai was publishing public market content starting no later than February 20, 2026, approximately one week prior to Ruffner's termination with FOM.

68. FOM sent Ruffner a termination letter on or about February 27, 2026, demanding that Ruffner cease-and-desist any and all use of the FOM's property, along with any and all unauthorized reproduction of FOM's vendor's or clients' data, source code and/or information.

69. Despite receiving the cease-and-desist, Ruffner published a blog post explicitly directing viewers to skip using companies like FOM and use his Opticl.ai instead and even requested that FOM be a referral partner to Opticl.ai.

70. Ruffner has continued to promote Opticl.ai on his LinkedIn page and in a podcast in which Ruffner appeared on or about May, 18, 2026.

71. Ruffner's Opticl.ai business competes directly with FOM's AI-powered marketing services.

72. As a result of Ruffner's conduct, FOM faces potential liability to Eldil Corp. for Ruffner's violation of Eldil's Terms of Service.

73. As a result of Ruffner's conduct, FOM faces potential liability under the Federal Trade Commission Act, 15 U.S.C. § 45, with civil penalties up to $10,000 per violation.

74. As a result of Ruffner's conduct, FOM has suffered loss of competitive advantage because Ruffner is using FOM's proprietary methodologies to compete against FOM.

75. As a result of Ruffner's conduct, FOM has suffered breach of client trust and confidentiality.

76. As a result of Ruffner's conduct, FOM has incurred costs for remediation, investigation, and legal fees.

77. Ruffner's conduct was willful, intentional, and malicious.

78. Ruffner knew that his conduct violated the AI Use & Ethics Policy, the Employee Handbook, and his duty of loyalty to FOM.

79. Ruffner actively concealed his conduct and attempted to profit from it by selling the competing tool to FOM.

## COUNT I
## VIOLATION OF THE FEDERAL DEFEND TRADE SECRETS ACT
## (18 U.S.C. § 1836 et seq.)

80. FOM incorporates by reference all preceding paragraphs.

81. FOM possessed proprietary AI methodologies, client data pipelines, RAG setups, tool configurations, integrations with E2M, prompt libraries, custom GPTs, and internal automation systems.

82. This information constitutes trade secrets under because it derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

83. FOM took reasonable measures to keep this information secret by classifying it as strictly confidential under Section 12 of its AI Use & Ethics Policy, restricting access to authorized personnel, requiring employees to sign confidentiality agreements, and implementing a data classification system designating certain information as "Prohibited."

84. Ruffner misappropriated FOM's trade secrets by: (a) copying source code from Eldil Corp.'s platform, which FOM licensed and integrated into its proprietary workflows; (b) using FOM's proprietary AI methodologies and client data pipelines to train his personal AI

tool; (c) replicating FOM's tool configurations and integrations; (d) using "Prohibited" client data including campaign strategies, performance metrics, and potentially personally identifiable information without authorization; and (e) disclosing and using these trade secrets to create and market Opticl.ai as a competing product and/or company.

85. Ruffner knew or had reason to know that he was misappropriating trade secrets because: (a) he signed the AI Use & Ethics Policy on October 6, 2025, which explicitly classified these methodologies as strictly confidential and proprietary trade secrets; (b) FOM employed him and he had access to these trade secrets only in his capacity as an employee with confidentiality obligations; (c) he was aware that FOM paid Eldil $100 per client for the GEO service and charged clients $150 per client, demonstrating his knowledge of the value and proprietary nature of the service; and (d) he actively concealed his conduct by not reporting it, instead attempting to sell the competing tool to FOM.

86. The trade secrets are related to a product used in interstate commerce. Opticl.ai is marketed and sold online, making it available to customers across state lines and in interstate commerce.

87. Ruffner's misappropriation was willful and malicious.

88. As a direct and proximate result of Ruffner's misappropriation, FOM has suffered and continues to suffer damages, including loss of competitive advantage, loss of profits, cost of remediation, potential liability to Eldil Corp., potential FTC liability, and breach of client trust and confidentiality.

89. FOM is entitled to injunctive relief pursuant to prevent actual or threatened misappropriation of its trade secrets.

90. FOM is entitled to damages for actual loss caused by Ruffner's misappropriation.

91. FOM is entitled to damages for unjust enrichment caused by Ruffner's misappropriation that is not addressed in computing damages for actual loss.

92. FOM is entitled to exemplary damages in an amount not more than two times the amount of damages awarded under this count because the misappropriation was willful and malicious.

93. FOM is entitled to reasonable attorneys' fees.

## COUNT II
## VIOLATION OF THE OKLAHOMA UNIFORM TRADE SECRETS ACT
## (Okla. Stat. tit. 78, § 86 et seq.)

94. FOM incorporates by reference all preceding paragraphs.

95. FOM possessed proprietary AI methodologies, client data pipelines, RAG setups, tool configurations, integrations with E2M, prompt libraries, custom GPTs, and internal automation systems.

96. This information constitutes trade secrets under Oklahoma law because it derives independent economic value from not being generally known and is subject to reasonable efforts to maintain secrecy.

97. FOM took reasonable measures to keep this information secret by classifying it as strictly confidential under Section 12 of its AI Use & Ethics Policy, restricting access to authorized personnel, requiring employees to sign confidentiality agreements, and implementing a data classification system.

98. Ruffner misappropriated FOM's trade secrets by: (a) copying source code from Eldil Corp.'s platform, which FOM licensed and integrated into its proprietary workflows; (b) using FOM's proprietary AI methodologies and client data pipelines to train his personal AI tool; (c) replicating FOM's tool configurations and integrations; (d) using "Prohibited" client data including campaign strategies, performance metrics, and potentially personally identifiable information without authorization; and (e) disclosing and using these trade secrets to create and market Opticl.ai as a competing product and/or company.

99. Ruffner knew or had reason to know that he was misappropriating trade secrets because he signed the AI Use & Ethics Policy, which explicitly classified these methodologies as proprietary trade secrets, and he was employed by FOM with access to these trade secrets only in his capacity as an employee with confidentiality obligations.

100. Ruffner used the trade secrets to FOM's detriment. FOM has suffered: (a) loss of competitive advantage because Ruffner is now operating a competing business using FOM's proprietary methodologies; (b) potential liability to Eldil Corp. for Ruffner's violation of Eldil's Terms of Service; (c) potential FTC liability under 15 U.S.C. § 45 with civil penalties up to $10,000 per violation; (d) breach of client trust and confidentiality; (e) loss of profits from clients who may use Opticl.ai instead of FOM's services; and (f) reputational harm.

101. FOM has suffered and continues to suffer damages as a direct and proximate result of Ruffner's misappropriation.

102. FOM is entitled to damages for actual loss caused by the misappropriation.

103. FOM is entitled to damages for unjust enrichment caused by the misappropriation.

104. FOM is entitled to exemplary damages in an amount not more than two times the amount of damages awarded under this count because the misappropriation was willful and malicious.

105. FOM is entitled to reasonable attorneys' fees.

**COUNT III**
**CONVERSION OF INTELLECTUAL PROPERTY**

106. FOM incorporates by reference all preceding paragraphs.

107. FOM owned and had the exclusive right to possess its proprietary AI methodologies, client data pipelines, RAG setups, tool configurations, integrations with E2M, prompt libraries, custom GPTs, and internal automation systems.

108. FOM established and declared its ownership by: (a) Section 3 of the AI Use & Ethics Policy, which states that internal tools, methodologies, AI workflows, and proprietary systems remain the exclusive property of Fox & Owl Marketing; (b) the Employee Handbook, which establishes that all work created using company-owned devices or within company platforms remains the intellectual property of Fox & Owl Marketing; and (c) Ruffner's employment relationship with FOM, which created a duty to maintain the confidentiality and exclusivity of FOM's intellectual property.

109. Ruffner exercised dominion and control over FOM's intellectual property without authorization by: (a) copying source code from Eldil Corp.'s platform, which FOM licensed and integrated into its proprietary workflows; (b) using FOM's proprietary AI methodologies and client data to train his personal AI tool; (c) replicating FOM's tool configurations and integrations; (d) creating and operating Opticl.ai as a competing product that incorporates FOM's intellectual property; and (e) marketing and selling Opticl.ai.

110. Ruffner's exercise of dominion and control was inconsistent with FOM's ownership because: (a) Ruffner did not have authorization to use FOM's intellectual property for personal purposes; (b) Ruffner did not have authorization to create a competing product; (c) Ruffner did not have authorization to disclose or commercialize FOM's proprietary methodologies; and (d) Ruffner's use of FOM's intellectual property to create a competing business directly conflicts with FOM's exclusive ownership rights.

111. As a direct and proximate result of Ruffner's conversion, FOM suffered damages, including: (a) loss of competitive advantage because Ruffner is using FOM's intellectual property to compete against FOM; (b) loss of profits from the sale of Opticl.ai; (c) cost of remediation including deletion of proprietary materials, investigation, and legal fees; (d) potential liability to Eldil Corp. for Ruffner's violation of Eldil's Terms of Service; and (e) potential FTC liability for unfair competition.

## COUNT IV
## BREACH OF DUTY OF LOYALTY AS AN EMPLOYEE

112. FOM incorporates by reference all preceding paragraphs.

113. An employment relationship existed between FOM and Ruffner. FOM hired Ruffner as a Marketing Specialist June 1, 2025, with a salary of $75,000 per year, plus performance bonuses. Ruffner's employment continued through February 27, 2026, when FOM terminated his employment.

114. As a FOM employee, Ruffner owed FOM a duty of loyalty.

115. Ruffner breached his duty of loyalty by usurping a corporate opportunity,

116. Ruffner identified an opportunity to create an AI/GEO tool based on his knowledge of FOM's business, client needs, and proprietary methodologies gained through

his employment, and pursued that opportunity for personal benefit rather than disclosing it to FOM or pursuing it on FOM's behalf.

117. Ruffner breached his duty of loyalty by competing with FOM while still employed.

118. While a FOM employee, Ruffner created Opticl.ai as a direct competitor to FOM's AI-powered marketing services, marketing and selling the tool at the same price point ($150 per client) that FOM charges clients.

119. Ruffner breached his duty of loyalty by using FOM's confidential information for personal benefit.

120. Ruffner used FOM's proprietary AI methodologies, client data pipelines, tool configurations, and integrations to create Opticl.ai.

121. Ruffner breached his duty of loyalty by failing to disclose conflicts of interest.

122. Ruffner did not disclose to FOM that he was developing a competing product or that he intended to sell the product to FOM's clients.

123. Ruffner breached his duty of loyalty by actively concealing his unlawful conduct from FOM.

124. Ruffner did not self-report his activities and only disclosed them through an unsolicited sales pitch to FOM.

125. Oklahoma recognizes the faithless servant doctrine as a remedy to seek recovery of compensation paid to an employee who breaches duties of loyalty. *Fox v. Crowgey*, 2015 OK CIV APP 23, 346 P.3d 425, 433–34, 436.

126. Under the faithless servant doctrine, an employee who engages in willful and intentional conduct that is disloyal or in breach of the duty of loyalty forfeits all compensation earned during the period of disloyalty.

127. As a direct and proximate result of Ruffner's breach, FOM suffered damages, including: (a) loss of competitive advantage; (b) loss of profits from the sale of Opticl.ai; (c) cost of remediation; (d) potential liability to Eldil Corp. and the FTC; (e) breach of client trust and confidentiality; and (f) payment of wages to a faithless servant.

## COUNT V
## BREACH OF EMPLOYMENT CONTRACT

128. FOM incorporates by reference all preceding paragraphs.

129. A valid employment contract existed between FOM and Ruffner. The contract was established by an offer letter dated May 29, 2025, signed by both Bryan Sekine, FOM CEO, and Ruffner, establishing Ruffner as a Marketing Specialist effective June 1, 2025, with a salary of $75,000 per year plus performance bonuses. The offer letter incorporated by reference the company policies, including the Employee Handbook and the AI Use & Ethics Policy.

130. The employment contract included the following terms: (a) Ruffner would work as a Marketing Specialist for FOM; (b) Ruffner would be paid a salary of $75,000 per year, plus performance bonuses; (c) Ruffner would comply with all company policies, including the Employee Handbook and the AI Use & Ethics Policy; (d) Ruffner would maintain the confidentiality of client information and proprietary business operations; (e) Ruffner would not disclose internal projects, client results, or confidential data; and (f) Ruffner would avoid conflicts of interest and disclose any potential conflicts to leadership.

131. Ruffner breached the employment contract by violating the confidentiality obligations by using client data to train his personal AI tool without consent.

132. Ruffner breached the employment contract by violating the prohibition on disclosure of internal projects and confidential data by replicating FOM's proprietary AI methodologies and using them to create Opticl.ai.

133. Ruffner breached the employment contract by violating the conflict of interest provisions by developing and attempting to sell a competing product without disclosing the conflict to FOM.

134. Ruffner breached the employment contract by violating the requirement to comply with the AI Use & Ethics Policy by committing multiple violations of that policy.

135. Ruffner breached the employment contract by violating his duty to act in FOM's best interests by pursuing a competing business opportunity for personal gain.

**COUNT VI**
**BREACH OF CONTRACT PURSUANT TO AI ETHICS POLICY**

136. FOM incorporates by reference all preceding paragraphs.

137. A valid contract existed between FOM and Ruffner through the AI Use & Ethics Policy v2.0, effective October 6, 2025, which Ruffner signed and acknowledged. The AI Use & Ethics Policy is a binding contract that established specific obligations for Ruffner's use of AI tools and handling of confidential information.

138. The AI Use & Ethics Policy established the following contractual obligations:

a) Section 1: Ruffner must use AI responsibly and ethically, with a Client-First Approach that does not compromise client privacy, intellectual property, or trust;

b) Section 2.1: Ruffner must never input "Prohibited" data into any AI tool;

c) Section 2.2: Ruffner must not use inputs for model training without explicit consent;

d) Section 3: Ruffner must not infringe on the intellectual property rights of others and must ensure that internal tools and proprietary systems remain the exclusive property of FOM;

e) Sections 4.1 and 4.2: Ruffner may only use tools approved by leadership and must submit any new tool request to the department lead for approval;

f) Section 7: Ruffner must not use AI tools to bypass security measures or access unauthorized information;

g) Section 12: Ruffner must treat all internal AI systems and strategies as confidential trade secrets and must not disclose, share, or demonstrate proprietary AI practices to external parties without explicit written permission from executive leadership; and

h) Section 10: Ruffner must immediately report suspected data breaches, privacy violations, and unauthorized disclosure of proprietary AI methods.

139. Ruffner breached the AI Use & Ethics Policy by:

a) violating Section 1 by using client data to train a personal tool without consent, compromising client privacy and trust;

b) violating Section 2.1 by using "Prohibited" client data to train his personal AI tool;

c) violating Section 2.2 by using client data to train an unapproved AI tool without explicit consent;

d) violating Section 3 by copying Eldil source code in violation of Eldil's Terms of Service and by failing to ensure that internal tools remain the exclusive property of FOM;

e) violating Sections 4.1 and 4.2 by creating and deploying an unapproved AI tool without leadership approval or the required security and compliance evaluations;

f) violating Section 7 by creating an unauthorized account in Bryan Sekine's name without consent and adding a client to the tool without management's consent;

g) violating Section 12 by replicating FOM's proprietary AI workflow and attempting to commercialize it for personal financial gain; and

h) violating Section 10 by failing to report the conduct and actively concealing it by attempting to sell the tool to FOM rather than reporting the breach.

## COUNT VII
## UNJUST ENRICHMENT

140. FOM incorporates by reference all preceding paragraphs.

141. During his employment with FOM from June 1, 2025, through February 27, 2026, Ruffner had access to and received the benefit of FOM's proprietary AI methodologies, client data pipelines, RAG setups, tool configurations, integrations with E2M, prompt libraries, custom GPTs, internal automation systems, and confidential business information.

142. Ruffner stole and used FOM's trade secrets and proprietary methodologies to create an unauthorized AI/GEO tool that became the foundation for Opticl.ai, thereby accepting the benefits of the secrets and methodologies and enriching himself.

143. Ruffner used these proprietary assets to create and operate Opticl.ai as a competing business.

144. Ruffner is currently operating Opticl.ai, marketing and selling an AI/GEO tool that incorporates FOM's intellectual property, proprietary methodologies, and client data.

145. Opticl.ai competes directly with FOM's AI-powered marketing services.

146. Ruffner has been enriched by the revenues and business opportunities generated by Opticl.ai, which was built using FOM's proprietary assets.

147. It would be inequitable for Ruffner to retain these benefits given his contractual obligations to FOM, his breach of fiduciary duty, his misappropriation of trade secrets, and his active concealment of his wrongdoing.

148. As a direct and proximate result of Ruffner's unjust enrichment, FOM has suffered damages.

149. FOM put time, money, and effort into creating and protecting its trade secrets and proprietary methodologies and Ruffner has stolen them and is making money off them without putting in time, money, or effort.

## PRAYER FOR RELIEF

WHEREFORE, FOM respectfully requests that this Court enter judgment in favor of FOM and against Ruffner on all counts and award FOM:

150. A temporary restraining order and preliminary injunction to prevent Ruffner from:

a) using, disclosing, or commercializing FOM's trade secrets and proprietary methodologies;

b) operating Opticl.ai or any competing business that uses FOM's intellectual property;

c) contacting or soliciting FOM's clients; and (d) using any client data obtained during his employment with FOM;

151. A permanent injunction prohibiting Ruffner from using, disclosing, or commercializing FOM's trade secrets and proprietary methodologies;

152. Compensatory damages for: (a) loss of competitive advantage; (b) loss of profits; (c) cost of remediation; (d) potential liability to Eldil Corp.; (e) potential FTC liability; and (f) breach of client trust and confidentiality;

153. A constructive trust over all assets, property, revenues, and business opportunities of Opticl.ai Intelligence Network, requiring Ruffner to transfer and convey all such assets to FOM, as these assets were acquired through Ruffner's misappropriation of FOM's trade secrets, proprietary information, and confidential business information, and through Ruffner's breach of fiduciary duty, breach of contract, and other wrongful conduct, and it would be inequitable for Ruffner to retain these assets given that they were obtained through his wrongful acts and in violation of his obligations to FOM.

154. Exemplary damages pursuant to 18 U.S.C. § 1836 and 78 O.S. § 88, because Ruffner's misappropriation was willful and malicious;

155. Unjust enrichment damages not addressed in computing damages for actual loss, including any profits Ruffner obtained from operating Opticl.ai;

156. Forfeiture of all compensation paid to Ruffner during the period of his disloyalty under the faithless servant doctrine;

157. Reasonable attorneys' fees and costs;

158. Prejudgment and post-judgment interest at the maximum rate allowed by law;

159. An order requiring Ruffner to delete and destroy all copies of FOM's proprietary materials, client data, and trade secrets in his possession or control;

160. An order requiring Ruffner to take down the Opticl.ai website and cease all marketing and sales of the competing product; and

161. Such other and further relief as the Court deems just and proper.

**JURY DEMAND**

FOM demands a trial by jury on all issues so triable.

Respectfully submitted,

*/s/ Alex M. Sharp*
Alex M. Sharp, OBA No. 31876
Davis Businsess Law, PLLC
5500 North Western Ave; Suite 106
Oklahoma City, OK 73118
Phone: (405) 500-0145
Fax: (580) 701-2448
asharp@davisbusinesslaw.com
**ATTORNEYS FOR PLAINTIFF**

# VERIFICATION

I, Bryan Sekine, state that I am the CEO of Fox & Owl Marketing LLC, the FOM in the above-captioned action. I have read the foregoing Verified Complaint and know the contents thereof. The facts alleged in the Complaint are true and correct to the best of my knowledge, information, and belief. Pursuant to 28 USCS § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Bryan Sekine, CEO
Fox & Owl Marketing LLC